**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **LITEPANELS, LLC and LITEPANELS, INC.** | § § § | |
| Plaintiffs | § § | |
| vs. | § § § | **CASE NO. 2:06-CV-167
PATENT CASE** |
| **GEKKO TECHNOLOGY, LTD.** | § § | |
| Defendant | § | |

**MEMORANDUM OPINION**

This Memorandum Opinion construes the terms in United States Patent Nos. 6,749,310 (the "'310 patent"); 6,948,823 (the "'823 patent"); and 7,163,302 (the "'302 patent").

**BACKGROUND**

The patents-in-suit deal with illumination technology for the film, commercial, and photographic industries. Currently in these industries, the most common lighting systems use incandescent or fluorescent lights, both of which have several disadvantages. Incandescent lights require bulky mounting devices, give off intense heat, and change hue when the intensity level changes. Fluorescent lights require a tube-like casing, do not offer a low-level intensity of light, and also change hue when the intensity varies. Both lighting systems usually require customization, making changes more difficult, and can produce uneven, or shadow, effects.

The inventions of the '310 patent relate to a lighting effects system for illuminating a wide area. The '310 patent contemplates using semiconductor light elements, light emitting diodes ("LED") or light emitting crystals ("LEC"), to produce quality light for movie or film applications. The LEDs are arranged on a lighting device, which is designed to adapt to various camera types.

The '823 patent is a continuation-in-part of the '310 patent. The inventions of the '823 patent address issues that arose in the '310 patent inventions, mainly the build up of heat from the numerous LEDs or LECs. The inventions of the '823 patent use surface-mount light elements as opposed to "through-hole" light elements. By decreasing the build up of heat, the device can contain an increased number of LEDs or LECs, which would provide greater quality and quantity of illumination.

The '302 patent, a continuation of the '823 patent, improves on the quality of illumination. The inventions of the '302 patent call for "daylight" or Tungsten color balanced LEDs, which better address the needs of the movie and film industry.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very

instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the

specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

## CLAIM TERMS

*Surface mount light elements/ Surface mount semiconductor light elements*

The term "surface mount light elements" appears in the '823 patent; "surface mount semiconductor light elements" appears in the '302 patent. Because of the "semiconductor" limitation in the '302 patent, Litepanels contends that two separate constructions are needed for each term. Gekko proposes the following construction for both terms: "light component designed to be soldered to a surface of a circuit board."

Regarding the '823 patent, the specification states that an advantage of the "surface mount" is the heat dissipation capabilities, "particularly as compared to non-surface mount LEDs which tend to dissipate heat typically through their leads." '823 patent, Col. 24:34–36. It teaches that using surface mount light elements provides a "larger and more direct heat conduction path to the mounting surface." *Id*. at Col. 24:37–38. While the specification describes the advantages of surface

mounts, it does not provide a clear definition of the term.

Because the specification lacks clear guidance on the meaning of "surface mount," both Gekko and Litepanels based their proposed constructions on the Wiley Electrical and Electronics Engineering Dictionary's ("Wiley Dictionary") definition of "surface mount." The Wiley Dictionary defines surface mount as "a technology for mounting components and devices in which the connections are soldered to a surface, as opposed to having leads which pass through said surface." Wiley Electrical and Electronics Engineering Dictionary (2004).

When reading the advantages described in the specification together with the definition of "surface mount," Gekko's proposal is too broad. Gekko's construction excludes a key portion of the definition: "as opposed to having leads which pass through said surface." Gekko argues that the Wiley Dictionary's definition does not require the substrate to appear without holes; however, the specification contemplates otherwise. As discussed above, one of the main advantages of surface mounts are the increased heat dissipation because of the increased contact to the mounting surface. '823 patent, Col. 24:34–36. These advantages would be greatly diminished, and possibly nullified, if holes were drilled into the surface. Therefore, reading the claim in light of the specification of which it is a part, Gekko's proposed construction is improper.

Litepanels proposes the phrase means "a light emitting element where the electrical leads are designed to be soldered to a surface of a circuit board, rather than mounted through a hole in the circuit board." The first part of Litepanels's proposed construction tracks the Wiley Dictionary's definition. The second part of Litepanels's construction ties the specification in with the definition by excluding through-hole mounts.

Because the specification teaches the advantage of surface mounting is the lack of holes, the construction needs to include that limitation. Thus, the Court construes "surface mount light

5

elements" to mean "a light emitting element where the electrical leads are designed to be soldered to a surface of a circuit board, rather than mounted through a hole in the circuit board."

The '302 patent claims contain a "semiconductor" limitation. As a continuation of the '823 patent, the '302 patent contains the same discussion of "surface mount" advantages. Gekko's universal construction removes the "semiconductor" limitation present in the '302 patent claims, which impermissibly broadens the claim language. Therefore, the Court construes "surface mount semiconductor light elements" to mean "a semiconductor light emitting element where the electrical leads are designed to be soldered to a surface of a circuit board, rather than mounted through a hole in the circuit board."

*Readily disengaged*

The term "readily disengaged" appears in both the '823 and '302 patents. Litepanels contends that the term's plain meaning should apply. Gekko proposes "readily disengaged" should be construed as "capable of being disengaged from a lighting frame by manually applying pressure to release locking tabs and twisting in an opposite direction from that originally used to bring it into a locking position." Although the claim language does not reference limitations such as "locking tabs," "manually applying pressure," or "twisting" in certain directions, Gekko's construction tracks one of the preferred embodiments. *See* '823 patent, Col. 10:56–62; '302 patent, Col. 10:56–62. It argues that this embodiment is the only reference made to "readily disengaged" in the specifications and, thus, must be used to construe the phrase.

"Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc*, 156 F.3d at 1187. In both patents, the specification also references other methods for affixing the camera mounting assembly. The specifications state,

6

"the mounting assembly receptor may comprise any suitable mechanism." '823 patent, Col. 10:30–32; '302 patent, Col. 10:30–32. They teach that "a variety of other means may alternatively be used to affix a camera mounting assembly." '823 patent, Cols. 11:1–2, 12:36–37; '302 patent, Cols. 11:1–2, 12:36–37. The specifications also state that the camera mounting assembly figures are "merely examples" and other assemblies may be used. '823 patent, Col. 13:40–44; '302 patent, Col. 13:40–44. Adopting Gekko's construction would limit the claim to a preferred embodiment. *See Phillips*, 415 F.3d at 1323 (warning against confining claims to a particular embodiment).

Neither the specification nor claim language gives "readily disengaged" a special meaning. In fact, the specification states a "variety" of methods for attachment exist, which indicates a variety of methods for detachment exist. When reading the phrase in the context of the claim language, no ambiguity exists. A lay juror will have no difficulty in understanding what "readily disengaged" means. *See Philips*, 415 F.3d at 1314. It is difficult to conceive of a more clear way to convey the meaning of this phrase; accordingly, the Court does not construe "readily disengaged."

*Continuous source of illumination*

The phrase "continuous source of illumination" appears in the '823 and '302 patents. Gekko's proposed construction is "illumination with an uninterrupted source of current." Gekko contends that for illumination to be continuous, the source of current must be uninterrupted. Gekko offers no intrinsic evidence to support its construction; it only offers its expert's assertion that "[Gekko's definition] is consistent with the specification of the '823 and '310 patent specification."

An expert's conclusory allegations are entirely unhelpful to the Court. *Phillips*, 415 F.3d at 1317. Because neither Gekko nor its expert offers any supporting evidence to show how its construction is consistent with the specifications, the assertion is conclusory and unhelpful.

Gekko's proposed construction would render the '823 patent's Claim 1 incompatible with

dependent Claim 2. Although Claim 2 is not asserted, it is helpful in construing this phrase. *See Phillips*, 415 F.3d at 1314 (usage of a term in one claim can often illuminate the meaning of the same term in other claims). Claim 2 is dependant upon Claim 1, which requires the light elements' illumination level to be controlled using pulse width modulation ("PWM"). '823 patent, Col. 31:2–17. Neither party disputes that PWM involves interrupting the power current. Claim 2 requires the light elements to provide a "continuous source of illumination." *Id*. at Col. 31:18–20. Applying Gekko's construction of "uninterrupted current" would render Claim 1 incompatible with Claim 2.

Gekko's construction focuses on the power source for the illumination, but the intrinsic evidence does not support this view. The proper focus is the visible effect not the power source. The specification discusses controlling visible effects, such as "strobing," "dimming," "pulsation," and "pattern generation." *See id*. at Cols. 19:7–52; 20:36–38. In one embodiment, the specification teaches "the lighting assembly 4600 can provide continuous light or, if applicable, various lighting effects." *Id*. at Col. 22:40–44. The positioning of continuous light as an alternative to "various lighting effects" further supports that the specification focuses on the effect as perceived by the eye and not on the power source.

The specification does not prescribe a special meaning for "continuous source of illumination." As Gekko stated in its moving papers, one skilled in the art of photography lighting would readily understand this phrase. Also, a lay juror would have no problem understanding what "continuous source of illumination" means. Therefore, the Court does not construe this term.

*Distribute light over a wide area*

The phrase "distribute light over a wide area" appears in the '310 patent. Before the hearing, the parties agreed to construe this phrase as "lighting an area comprising an angle of view of a camera lens comprising any angle diverging from 0 degrees from the centerline of the camera lens

to and including 90 degrees from either side of said centerline, but not including illumination for object inspection systems."

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in a table as Appendix B. The claims with the disputed terms in bold are set forth in Appendix A.

**So ORDERED and SIGNED this 6th day of December, 2007.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**

# APPENDIX A

## U.S. Patent No. 6,948,823

45. An illumination system, suitable to provide proper illumination for lighting of a subject in film or video, comprising: a lightweight, portable frame having a panel including a **mounting surface**; and a plurality of semiconductor light elements disposed on said **mounting surface**; wherein said portable frame is adapted for being securably attached to and **readily disengaged** from a movable camera apparatus such that, when mounted, said portable frame follows movements of the movable camera apparatus; and wherein said semiconductor light elements comprise **surface-mount light elements**.

46. The illumination system of claim 45, wherein said portable frame acts as a heat sink to dissipate heat generated by said **surface-mount light elements**.

49. The illumination system of claim 45, further comprising a **control input** for **selectively controlling an illumination level** of said semiconductor light elements.

50. The illumination system of claim 49, wherein said semiconductor light elements provide a **continuous source of illumination**.

53. The illumination system of claim 45, wherein said semiconductor light elements **emit light at a color temperature range spanning daylight color temperature**.

72. An illumination system suitable to provide proper illumination for lighting of a subject in film or video, comprising: a lightweight, portable frame having a **panel** including a **mounting surface**; a plurality of semiconductor light elements disposed on said **mounting surface**; and an integrated lens cover for adjusting the focus of light emitted by said semiconductor light elements; wherein said portable frame is adapted for being securably attached to and **readily disengaged** from a movable camera apparatus such that, when mounted, said portable frame follows movements of the movable camera apparatus.

74. The illumination system of claim 72, further comprising a **control input** for **selectively controlling an illumination level** of said semiconductor light elements.

75. The illumination system of claim 74, wherein said semiconductor light elements provide a **continuous source of illumination**.

78. The illumination system of claim 72, wherein said semiconductor light elements **emit light at a color temperature range spanning daylight color temperature**.

80. The illumination system of claim 72, wherein said portable frame is substantially **ring-shaped**.

85. An illumination system suitable to provide proper illumination for lighting of a subject in film or video, comprising: a lightweight, portable frame having a **panel** including a **mounting surface**; and a plurality of semiconductor light elements disposed on said **mounting surface**; and a color gel securably attached to said portable frame; wherein said portable frame is adapted for being securably attached to and **readily disengaged** from a movable camera apparatus such that, when mounted, said portable frame follows movements of the movable camera apparatus.

86. The illumination system of claim 85, further comprising a **control input** for **selectively controlling an illumination level** of said semiconductor light elements.

87. The illumination system of claim 86, wherein said semiconductor light elements provide a **continuous source of illumination**.

90. The illumination system of claim 85, wherein said semiconductor light elements **emit light at a color temperature**

**range spanning daylight color temperature**.

### U.S. Patent No. 7,163,302

1. A lighting system suitable to provide proper illumination for lighting of a subject in film or video, comprising: a portable frame having a mounting surface; one or more surface-mount semiconductor light elements disposed on said mounting surface, said one or more **surface-mount semiconductor light elements** emitting light within a color temperature range suitable for image capture, at least one of said one or more **surface-mount semiconductor light elements** individually emitting light in a daylight color temperature range or a tungsten color temperature range; a heat sink for dissipating heat generated by said one or more **surface-mount semiconductor light elements**; and a **focusing element** for altering the focus or direction of the light emitted by said one or more **surface-mount semiconductor light elements**; wherein said portable frame is adapted for being mounted to and **readily disengaged** from a camera.

2. The lighting system of claim 1, wherein said **focusing element** comprises a lens or filter.

3. The lighting system of claim 1, wherein said **focusing element** comprises a plurality of discrete lenses or filters which separately focus the light emitted from said one or more surface-mount semiconductor light elements.

4. The lighting system of claim 1, wherein said **focusing element** is manually attachable to and detachable from the portable frame.

6. The lighting system of claim 1, wherein said one or more **surface-mount semiconductor light elements** comprise light emitting diodes (LEDs).

10. The lighting system of claim 1, wherein said at least one **surface-mount semiconductor light element** emits light at a color temperature of approximately 5500 degrees Kelvin.

11. The lighting system of claim 1, wherein said at least one **surface-mount semiconductor light element** emits light at a color temperature within a range including approximately 5500 7500 degrees Kelvin.

14. The lighting system of claim 1, wherein said one or more **surface-mount semiconductor light elements** emit light at a substantially non-variable color temperature.

15. The lighting system of claim 1, further including a color lens or color filter to adjust the light emitted from said one or more **surface-mount semiconductor light elements**.

16. The lighting system of claim 1, further including a diffusion lens or diffusion filter to adjust the light emitted from said one or more **surface-mount semiconductor light elements**.

17. The lighting system of claim 1, further comprising an intensity control circuit for adjusting the intensity of light output by said one or more **surface-mount semiconductor light elements**.

21. The lighting system of claim 1, wherein at least a portion of said portable frame acts as a heat sink to dissipate heat generated by said one or more **surface-mount semiconductor light elements**.

22. The lighting system of claim 1, wherein said one or more **surface-mount semiconductor light elements** provide a **continuous source of illumination**.

### U.S. Patent No. 6,749,310

1. A wide area lighting effects system comprising: a frame comprising a **mounting surface**, said frame defining an opening positioned substantially in the center of said **mounting surface**; a plurality of **low power lights** arranged on said **mounting surface**, said **lower power lights** oriented so as to **distribute light over a wide area**; and a **mounting bracket** for attaching said frame to a camera such that the camera is positioned to view through the opening within said frame; wherein said frame comprises a **mounting assembly receptor**, and wherein said **mounting bracket** comprises

an attachment member adapted to secure to said **mounting assembly receptor**, and a camera clamp adapted to secure the **mounting bracket** to the camera.

2. The wide area lighting effects system of claim 1, wherein said frame is substantially **ring-shaped**, and wherein said opening is circular in shape.

4. The wide area lighting effects system of claim 1, wherein said **low power lights** comprise light-emitting diodes (LEDs) or light-emitting crystals (LECs).

5. The wide area lighting effects system of claim 4, wherein said LEDs or LECs are oriented perpendicular to said **mounting surface**.

6. The wide area lighting effects system of claim 4, further comprising a variable control for electronically controlling intensity levels of said **low power lights**.

7. The wide area lighting effects system of claim 6, wherein the intensity levels of said **low power lights** are collectively controllable.

8. The wide area lighting effects system of claim 6, wherein the intensity levels of said **low power lights** are **individually or groupwise controllable**.

9. The wide area lighting effects system of claim 4, wherein a plurality of said **low power lights** are filtered so as to produce colorized light.

10. The wide area lighting effects system of claim 4, further comprising a programmable processor controlling the on/off states and light intensity levels of said **low power lights**.

12. The wide area lighting effects system of claim 4, further comprising a plurality of switches connecting a power source to said **low power lights**, and **switch selector** whereby the on/off states of said switches are selected, thereby controlling whether the **low power lights** are on or off.

13. A method of providing lighting over a **subject area**, comprising the steps of: arranging a plurality of **low power lights** on the **mounting surface** of a frame, said frame defining an opening located substantially in the center of said **mounting surface**, said lower power lights oriented so as to **distribute light over a wide area**; attaching a camera mounting assembly to said frame; and attaching said mounting assembly to a camera such that the camera is positioned to view through the opening within said frame; wherein said frame comprises a **mounting assembly receptor**, and wherein said **mounting bracket** comprises an attachment member adapted to secure to said **mounting assembly receptor**, and a camera clamp adapted to secure the **mounting bracket** to the camera.

14. The method of claim 13, wherein said frame is substantially **ring-shaped**, and wherein said opening is circular in shape.

16. The method of claim 13, wherein said **low power lights** comprise light-emitting diodes (LEDs) or light-emitting crystals LECs).

17. The method of claim 16, wherein said LEDs or LECs are oriented perpendicular to said **mounting surface**.

18. The method of claim 16, further comprising a variable control for electronically controlling intensity levels of said **low power lights**.

19. The method of claim 18, further comprising the step of collectively controlling the intensity levels of said **low power lights**.

20. The method of claim 18, further comprising the step of individually or groupwise controlling the intensity levels of said **low power lights**.

21. The method of claim 16, further comprising the step of filtering a plurality of said **low power lights** so as to produce colorized light.

24. The method of claim 16, further comprising the steps of connecting a power source to said low power lights through a plurality of switches, and controlling the on/off states of said switches through a **switch selector**, thereby controlling whether the **low power lights** are on or off.

# APPENDIX B

| Claim Terms to be Construed | Court's Construction |
|---|---|
| Surface mount light elements<br><br>('823 patent, Claims 45 and 46) | A light emitting element where the electrical leads are designed to be soldered to a surface of a circuit board, rather than mounted through a hole in the circuit board |
| Surface mount semiconductor light elements<br><br>('302 patent, Claims 1, 6, 10, 11, 14–17, 21–22) | A semiconductor light emitting element where the electrical leads are designed to be soldered to a surface of a circuit board, rather than mounted through a hole in the circuit board |
| Readily disengaged<br><br>('823 patent, Claims 45, 72, and 85)<br><br>('302 patent, Claim 1) | No construction |
| Continuous source of illumination<br><br>('823 patent, Claims 50, 75, and 87)<br><br>('302 patent, Claim 22) | No construction |
| Distribute light over a wide area<br><br><br><br><br><br>('310 patent, Claims 1 and 13) | AGREED- "Lighting an area comprising an angle of view of a camera lens comprising any angle diverging from 0 degrees from the centerline of the camera lens to and including 90 degrees from either side of said centerline, but not including illumination for object inspection systems" |
| Ring-shaped<br><br>('823 patent, Claim 80)<br><br>('310 patent, Claims 2 and 14) | AGREED- "Round with an opening substantially in the center" |
| Individually or groupwise controllable<br><br>('310 patent, Claim 8) | AGREED- "Can be controlled either individually, or in subset groups of two or more" |
| Focusing element<br><br>('302 patent, Claims 1–4) | AGREED- "An optical component which alters the focus or direction of emitted light." |
| Mounting Surface<br><br>('832 patent, Claims 45, 72, and 85)<br><br>('310 patent, Claims 1, 5, 13, and 17) | AGREED- Plain meaning |
| Panel<br><br>('823 patent, Claims 45, 72, and 85) | AGREED- Plain meaning |
| Emit light at a color temperature range spanning daylight color temperature<br><br><br><br>('823 patent, Claims 53, 78, and 90) | AGREED- Plain meaning |

14

| Claim Terms to be Construed | Court's Construction |
|---|---|
| Control input<br><br>('823 patent, Claims 49, 74, and 86) | AGREED- Plain meaning |
| Selectively controlling and illumination level<br><br>('823 patent, Claims 49, 74, and 86) | AGREED- Plain meaning |
| Low power lights<br><br>('310 patent, Claims 1, 4, 6–9, 12, 13, 16, 18–21, and 24) | AGREED- Plain meaning |
| Mounting bracket<br><br>('310 patent, Claims 1 and 13) | AGREED- Plain meaning |
| Switch selector<br><br>('310 patent, Claims 12 and 24) | AGREED- Plain meaning |
| Mounting assembly receptor<br><br>('310 patent, Claims 1 and 13) | AGREED- Plain meaning |
| subject area<br><br>('310 patent, Claim 13) | AGREED- Plain meaning |